An unpublished order shall not be regarded as precedent and shall not be cited as legal authority. SCR 123.

IN THE SUPREME COURT OF THE STATE OF NEVADA

MANUEL SAUCEDO LOPEZ,
Appellant,
vs.
E.K. MCDANIEL, WARDEN; AND THE
STATE OF NEVADA,
Respondents.

No. 61535

**FILED**

OCT 23 2015

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY _____
DEPUTY CLERK

### ORDER OF AFFIRMANCE

This is an appeal from an order of the district court denying appellant Manuel Saucedo Lopez's post-conviction petition for a writ of habeas corpus. Eighth Judicial District Court, Clark County; Kenneth C. Cory, Judge.

Lopez was convicted of first-degree murder 29 years ago for the death of his 4-year-old step-daughter, Jessica. He was sentenced to death. This court affirmed the judgment and sentence of death. *Lopez v. State*, 105 Nev. 68, 769 P.2d 1276 (1989). Lopez unsuccessfully sought relief in two prior post-conviction proceedings. *Lopez v. State*, Docket No. 35492 (Order of Affirmance, March 5, 2001); *Lopez v. State*, Docket No. 23628 (Order of Affirmance, July 7, 1994). Lopez filed the instant petition in the district court on June 5, 2007. The district court dismissed the petition as procedurally barred and this appeal followed.

*Procedural bars*

Because Lopez filed his petition over one year after the remittitur issued in his direct appeal, the petition was untimely under NRS 34.726(1). To the extent that the petition raised the same claims that were raised in prior petitions, the petition was successive. NRS

SUPREME COURT
OF
NEVADA

(O) 1947A

15-32335

34.810(2). To the extent that the petition raised claims which could have been raised in a prior proceeding, the petition constituted an abuse of the writ. NRS 34.810(1)(b). The petition was therefore procedurally barred absent a demonstration of good cause and prejudice. NRS 34.726(1); NRS 34.810(1)(b), (3).

The State also pleaded laches. Under NRS 34.800, a petition may be dismissed if the delay in filing the petition prejudices the State. NRS 34.800(1). Prejudice is presumed when a petition is filed five years after a decision on direct appeal of a judgment of conviction. *See* NRS 34.800(2). NRS 34.800 bars claims unless the petitioner can demonstrate that he was reasonably diligent in discovering the facts underlying his petition to overcome the presumed prejudice to the State in responding to the petition, *see* NRS 34.800(1)(a), or that the failure to consider the petition amounts to a fundamental miscarriage of justice to overcome the presumed prejudice to the State in retrying the defendant, *see* NRS 34.800(1)(b). NRS 34.800 may consequently bar petitions even though a petitioner can show good cause and actual prejudice to satisfy NRS 34.726 and NRS 34.810. Therefore, even if Lopez could demonstrate that the district court erred in concluding that he failed to demonstrate good cause and prejudice, he has not asserted that the district court erred in applying the more onerous laches bar set forth in NRS 34.800. His failure to challenge the district court's application of laches warrants affirmance of the district court's decision. Nevertheless, we address his arguments concerning good cause and prejudice to determine whether the district court erred in concluding that the allegations failed to overcome the presumption of prejudice.

As cause to overcome the procedural default rules, Lopez contends that the State violated *Brady v. Maryland,* 373 U.S. 83 (1963) in failing to disclose evidence related to: (1) hair fibers; (2) Arturo Montes, a purported witness to Lopez's abuse; and (3) Maria Lopez, Lopez's wife. *Brady* obliges a prosecutor to reveal evidence favorable to the defense when that evidence is material to guilt, punishment, or impeachment. *Brady,* 373 U.S. at 87; *Mazzan v. Warden,* 116 Nev. 48, 66-67, 993 P.2d 25, 36-37 (2000) (identifying the three components of a successful *Brady* claim). As the State pleaded laches, Lopez must demonstrate that he could not have discovered the *Brady* evidence "by the exercise of reasonable diligence," NRS 34.800(1)(a), and that the evidence demonstrates a fundamental miscarriage of justice occurred, NRS 34.800(1)(b). *See also Rippo v. State,* 113 Nev. 1239, 1257, 946 P.2d 1017, 1028 (1997) ("[A] *Brady* violation does not result if the defendant, exercising reasonable diligence, could have obtained the information."). A fundamental miscarriage of justice requires "a colorable showing" that the petitioner is "actually innocent of the crime or is ineligible for the death penalty." *Pellegrini v. State,* 117 Nev. 860, 887, 34 P.3d 519, 537 (2001).

*Hair evidence*

Lopez contends that the State failed to disclose evidence related to hair fibers that he asserts undermines the State's expert testimony at trial. During the litigation of his federal habeas petition, Lopez obtained (1) crime scene analyst Carla Noziglia's report about hair recovered from the crime scene, (2) Noziglia's bench notes, and (3) a property report noting that Deputy District Attorney (DDA) Ray Jeffers instructed a detective to take possession of a brown extension cord that was purportedly used to abuse the victim but was not introduced at trial.

Lopez also deposed Dan Berkabile, the expert who testified at trial, about Noziglia's notes.

We conclude that Lopez failed to demonstrate that he employed reasonable diligence in discovering Noziglia's report and notes. *See* NRS 34.800(1)(a); *McClesky v. Zant*, 499 U.S. 467, 498 (1991) (noting a "petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief" in a first post-conviction petition). The trial record informed Lopez in 1985 that Noziglia performed some work on the hair fiber evidence. Although the State described her work as irrelevant, Lopez eventually disagreed with that representation and sought her bench notes during discovery in his second federal habeas petition. He did not allege that he requested the Noziglia documents during the litigation of a prior state or federal petition or the State improperly withheld them during either of those proceedings. Lopez further failed to demonstrate that the reports and physical evidence were exculpatory and therefore the withholding of them amounted to a fundamental miscarriage of justice. *See* NRS 34.800(1)(b). Berkabile's testimony and Noziglia's report were not so materially inconsistent as to demonstrate his actual innocence. They agreed that the hairs taken from the cords and macramé holder were consistent with Jessica's hair. The testimony and reports indicate that the experts tested different hair fibers; therefore, inconsistencies in the length of the hair fibers did not undermine the trial testimony. Moreover, even if Noziglia's report and notes impeached Berkabile's conclusion to some extent, Lopez failed to demonstrate that no rational juror would have found him guilty. Maria's testimony about Lopez repeatedly hanging Jessica by her hair was supported by other physical evidence: hair removed from the macramé

holder was only consistent with Jessica's hair; damage to the closet was consistent with Maria's description of Jessica falling from the closet rod she had been hung on; and the medical examiner testified that it would take considerable force to remove the amount of hair from Jessica's head that was missing at the time of her death. As Maria asserted that Lopez used the cord that was not introduced at trial in the abuse, it was not exculpatory evidence and the State had no duty to disclose it. *See Furbay v. State*, 116 Nev. 481, 487, 998 P.2d 553, 557 (2000) ("The prosecutor is under no general duty to provide inculpatory, as opposed to exculpatory, evidence to the defense."). However, the failure to disclose this evidence violated the State's open file policy. *See id.* ("When the prosecution purports to give all inculpatory evidence in its control, it may not withhold evidence for later use."). Nevertheless, Lopez has failed to demonstrate that the failure to disclose evidence which could further inculpate him in criminal activity amounted to a fundamental miscarriage of justice.

*Arturo Montes evidence*

Lopez argues that the State withheld evidence that impeached Montes' testimony that he saw Lopez abuse Jessica. During the litigation of his federal petition, Lopez received (1) arrest and detention records from the Las Vegas Metropolitan Police Department (LVMPD) indicating that Montes was incarcerated in the Clark County Detention Center on the dates he claimed to have seen Lopez abuse Jessica; (2) witness vouchers in the Clark County Comptroller's Office indicating that Montes had been compensated by the Clark County District Attorney's Office for pretrial interviews with the district attorney's office and three post-trial meetings; (3) a declaration from Maria's aunt declaring that Montes was not a friend of the family and did not baptize her daughter as he claimed during trial;

and (4) a declaration from Montes' half-brother, Carlos Montes, stating that Montes had never married and did not have a child as he claimed during trial.[1] When confronted with this evidence, Montes recanted his trial testimony and accused the State of pressuring him to testify falsely during the trial.

We conclude that Lopez failed to demonstrate that the facts underlying his claim could not have been discovered sooner through the exercise of reasonable diligence. Lopez knew Montes made false claims about being Maria's brother in 1986. Based on that knowledge, reasonably diligent counsel should have investigated Montes' credibility. Lopez could have then uncovered that Montes lied about being married, having a child, and baptizing Jessica's cousin within the time period for filing a timely post-conviction petition. Further, as the evidence undermining these aspects of Montes' testimony was provided by his family members, Lopez cannot demonstrate that reliance on the State's open file policy hindered his exercise of reasonable diligence. Post-conviction counsel acknowledged that he could have run a background check on Montes which would have revealed any arrests. Thereafter, reasonable diligent counsel would have investigated Montes' custody status as a result of those arrests. Lastly, Lopez failed to demonstrate that the prosecution was in possession of evidence that Montes was in jail

[1]Lopez also asserted that the trial record indicated that the State had conducted a National Crime Information Center check on Montes. He contended that the report would have shown that the State was aware that Montes was in custody at the time he purportedly witnessed abuse to which he testified at trial and thus would prove that the State suborned perjury. However, the disclosure revealed that the document had been mislabeled and was actually a Department of Motor Vehicles report.

during the time period he asserted he saw Jessica abused. *See United States v. Blanco*, 392 F.3d 382, 393-94 (9th Cir. 2004) (noting obligation to disclose *Brady* evidence in the possession of the prosecutor or investigating agency). While the prosecution has an obligation to disclose *Brady* evidence in the possession of the prosecutor or investigative agency, the detention center holding Montes was not involved in investigating Lopez. *See, e.g., United States v. Rodriguez*, 360 F. App'x 743, 747 (9th Cir. 2009) (providing that prosecution was not deemed to possess evidence of attack on codefendant in prison because the prison was not an investigating agency). In addition, considering Maria's testimony and the physical evidence, Lopez failed to demonstrate that no reasonable juror would have convicted him.

*Maria Lopez evidence*

Lopez contends that a newly disclosed Notice of Denial of Request to prosecute Maria and a detective's statements during her interview demonstrate that the State's decision not to prosecute her was arrived at too swiftly. He further contends that Rosaura Tanon's records, statements that indicated that the police feared Maria might flee the jurisdiction, statements that detectives made a deal with Maria for her testimony, and evidence that immigration and other state benefits were sought for Maria indicate that her testimony was not credible.[2]

---

[2]Lopez also contends that a correspondence between Ted Salazar and the district attorney's office contradicts DDA Jeffers' representation during argument on a motion for mistrial based on a *Brady* violation, that he did not know that Salazar was translating for Maria's interviews. However, as this evidence relates to the State's representations during a motion and has no bearing on Lopez's guilt or innocence, it is insufficient to demonstrate a fundamental miscarriage of justice.

We conclude that Lopez failed to demonstrate that he exercised reasonable diligence in discovering this evidence. Much of the evidence that Lopez relied upon concerning Maria was not in the possession of the State. *See Strickler v. Greene,* 527 U.S. 263, 287-88 (1999) ("In the context of a *Brady* claim, a defendant cannot conduct the 'reasonable and diligent investigation' mandated by *McClesky* to preclude a finding of procedural default when the evidence is in the hands of the State."). He obtained the documents through record requests to a victims' organization and the Immigration and Naturalization Service (INS). Lopez could have also obtained statements about threats by the prosecution prior to the instant petition. Because he received these documents from individuals and other agencies, he could not assert that the reliance on the State's open file policy impeded his ability to discover these documents in prior post-conviction litigation. *See Steese v. State,* 114 Nev. 479, 495, 960 P.2d 321, 331 (1998) ("*Brady* does not require the State to disclose evidence which is available to the defendant from other sources, including diligent investigation by the defense.").

Moreover, Lopez failed to demonstrate that the failure to consider the evidence would result in a fundamental miscarriage of justice. Tanon's opinion as to Maria's credibility was not admissible. *See Perez v. State,* 129 Nev., Adv. Op. 90, 313 P.3d 862, 870 (2013) ("A witness may not vouch for the testimony of another or testify as to the truthfulness of another witness."). Contrary to Lopez's assertion, the INS records do not indicate that the State sought permanent immigration benefits for Maria prior to her testimony; the State only requested that the INS refrain from deporting Maria until after she had testified in the case. Further, the records indicated that Maria was already familiar with and

was receiving state welfare benefits and it does not indicate that the State secured her benefits in addition to what she was already receiving. Lopez cannot demonstrate that no rational juror would have concluded that Maria's testimony was believable because she received the alleged inducements. Therefore, the district court did not err in denying this claim as barred by laches under NRS 34.800.

*Fundamental miscarriage of justice*

Lopez argues that the district court erred in denying his separate claims of actual innocence of first-degree murder and of the death penalty. A fundamental miscarriage of justice requires "a colorable showing" that the petitioner is "actually innocent of the crime or is ineligible for the death penalty." *Pellegrini*, 117 Nev. at 887, 34 P.3d at 537. This requires the petitioner to present new evidence of his innocence. *See House v. Bell*, 547 U.S. 518, 537 (2006) ("[A] gateway claim requires 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)); *Schlup*, 513 U.S. at 316 ("Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim."). When claiming a fundamental miscarriage of justice based on actual innocence, the petitioner "must show that it is more likely than not that no reasonable juror would have convicted him absent a constitutional violation." *Pellegrini*, 117 Nev. at 887, 34 P.3d at 537. In this context, "actual innocence means factual innocence, not mere legal insufficiency." *Mitchell v. State*, 122 Nev. 1269, 1273-74, 149 P.3d 33, 36 (2006) (internal

quotation marks and citations omitted). Similarly, when claiming a fundamental miscarriage of justice based on ineligibility for the death penalty, the petitioner "must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found him death eligible." *Pellegrini*, 117 Nev. at 887, 34 P.3d at 537.

*Actual innocence of first-degree murder*

Lopez argues that the district court erred in denying his claim that he is actually innocent of first-degree murder based on newly discovered evidence about Montes.[3] We conclude that, despite Montes' perjury, having considered all of the available evidence, Lopez has not satisfied his heavy burden to prove that the failure to consider his constitutional claim would result in a fundamental miscarriage of justice because some reasonable jurors would believe Maria's testimony and not have reasonable doubt about his guilt. At trial, the jury chose to believe Maria and convict Lopez. Her subsequent recantation, in and of itself, is not sufficient to undermine her trial testimony. *See Baldree v. Johnson*, 99 F.3d 659, 663 (5th Cir. 1996) (noting that "affidavits which recant witnesses' trial testimony are viewed with extreme suspicion by the courts"). She recanted while surrounded by Lopez's family and repeatedly

---

[3]Lopez also asserts that the district court employed the wrong legal standard and excluded exculpatory evidence from its consideration, did not consider the "cumulative exculpatory effect of Maria's recantation as compared against her trial testimony," and failed to consider other exculpatory physical evidence. We disagree. Although initially concluding that it should not consider all of the post-trial information in its actual-innocence analysis because it was not all newly discovered, the district court also concluded in its order that "even if [all of] this [post-trial] information could be considered, the Court still cannot conclude, by the appropriate standard, that no reasonable juror would have convicted Petitioner or sentenced him to death."

expressed a desire to end the interview. Although she denied that Lopez burned Jessica and hung her by her hair, she did not disavow his other abuse which included him striking her head on surfaces in the home. In subsequent interviews, she was evasive about the details surrounding Jessica's death but stated that she believed Lopez was guilty. In addition, the remaining evidence Lopez contends undermines Maria's trial testimony is insufficient to demonstrate actual innocence. The INS records do not support the contention that the State sought permanent benefits for Maria. The record also indicates that the family had already been receiving state welfare benefits prior to the murder.

*Actual innocence of the death penalty*

Lopez argues that the district court erred in denying his claim that he is actually innocent based on invalid aggravating circumstances. He contends that the depravity-of-mind aggravating circumstance found by the jury has no basis in law and the torture aggravating circumstance instructions did not inform the jury that the torture "must be intended to inflict pain beyond the killing itself."

We conclude that this argument lacks merit. The jury found two aggravating circumstances: the murder involved (1) torture and (2) depravity of mind. Since the verdict, this court has concluded that the depravity-of-mind aggravating circumstance, in and of itself, is not a valid aggravating circumstance upon which to find a defendant death eligible. *See Smith v. State,* 114 Nev. 33, 37 n.3, 953 P.2d 264, 266 n.3 (1998); *Domingues v. State,* 112 Nev. 683, 702, 917 P.2d 1364, 1377 (1996); *Robins v. State,* 106 Nev. 611, 629, 798 P.2d 558, 570 (1990); *see also Godfrey v. Georgia,* 446 U.S. 420 (1980). Here, however, the jury also found a separate aggravating circumstance, torture. Lopez contends that this

aggravating circumstance is also invalid because the jury was not instructed that the torture had to be some act of physical abuse beyond the act of killing itself. *See Robins*, 106 Nev. at 629, 798 P.2d at 570; *Domingues*, 112 Nev. at 702, 917 P.2d at 1377; *Smith*, 114 Nev. at 37 n.3, 953 P.2d at 266 n.3.[4] While Lopez may be correct about the instruction, this instructional error does not make the torture aggravating circumstance invalid. Had the jury been properly instructed that the torture aggravating circumstance required some act of physical abuse beyond the act of killing itself, some reasonable jurors would have believed Maria's testimony and concluded that his acts of abuse satisfied the torture aggravating circumstance making him eligible for the death penalty. *See Pellegrini*, 117 Nev. at 887, 34 P.3d at 537. For these reasons, Lopez cannot demonstrate that the failure to consider his petition would result in a fundamental miscarriage of justice.[5]

---

[4]Lopez also contends that the torture aggravating circumstance instruction removed the element of malice from the jury's consideration. Lopez is mistaken. Malice is supplied by the definition of torture. *See Hernandez v. State*, 124 Nev. 978, 985, 194 P.3d 1235, 1239 (2008), *overruled on other grounds by Armenta-Carpio v. State*, 129 Nev., Adv. Op. 54, 306 P.3d 395 (2013).

[5]Lopez also argues that his substantive constitutional claims require the reversal of his conviction and death sentence. However, as he failed to demonstrate that the district court erred in applying the procedural bars, consideration of these claims is unnecessary.

Having considered Lopez's contentions and concluded that they lack merit, we

ORDER the judgment of the district court AFFIRMED.[6]

_____, C.J.
Hardesty

_____, J.
Douglas

_____, J.
Gibbons

_____, J.
Parraguirre

_____, J.
Saitta

_____, J.
Pickering

CHERRY, J., dissenting:

I respectfully dissent. In my view, the district court erred in concluding that Lopez failed to overcome the bar of laches regarding his claim concerning Arturo Montes' perjury. I further conclude that the jury instruction regarding torture amounted to a fundamental miscarriage of justice as Lopez was ineligible for the death penalty.

*Montes' perjured testimony*

As cause to overcome the procedural bars, Lopez argued that the State violated *Brady v. Maryland,* 373 U.S. 83 (1963), in failing to disclose evidence that Montes committed perjury. This evidence included (1) records indicating that Montes was incarcerated on the dates he

---

[6]We deny the State's motion to strike portions of the reply brief as moot. We also deny Lopez's "Motion to Transmit Prosecution File Under Seal."

claimed to have seen Lopez abuse Jessica; (2) vouchers indicating that Montes had been compensated for pretrial interviews and post-trial meetings; (3) a declaration from Maria's aunt declaring that Montes was not a friend of the family and did not baptize her daughter as he claimed during trial; and (4) a declaration from Montes' half-brother, Carlos Montes, stating that Montes had never married and did not have a child as he claimed during trial. When confronted with this evidence, Montes recanted his trial testimony and accused the State of pressuring him to testify falsely during the trial.

To overcome the burden of laches, Lopez needed to demonstrate that he was reasonably diligent in discovering the facts underlying his petition to overcome the presumed prejudice to the State in responding to the petition, *see* NRS 34.800(1)(a); *see also Rippo v. State*, 113 Nev. 1239, 1257, 946 P.2d 1017, 1028 (1997) ("[A] *Brady* violation does not result if the defendant, exercising reasonable diligence, could have obtained the information."), and that the failure to consider the petition amounts to a fundamental miscarriage of justice to overcome the presumed prejudice to the State in retrying him, *see* NRS 34.800(1)(b); *Pellegrini v. State*, 117 Nev. 860, 887, 34 P.3d 519, 537 (2001) (providing that a fundamental miscarriage of justice requires "a colorable showing" that the petitioner is "actually innocent of the crime or is ineligible for the death penalty"). The majority concludes that Lopez failed to overcome the bar of laches because much of the evidence could have been obtained sooner by diligent counsel and that Lopez failed to demonstrate that no reasonable juror would have convicted him had this evidence been presented. I disagree with both these conclusions.

I conclude that diligent counsel could not have discovered all the evidence underlying Lopez's claim regarding Montes. Arguably, much of the evidence presented was obtained from interviewing members of Montes' and the victim's families. However, defense attorneys do not have unlimited resources to chase down every lead that presents itself. *See Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992) (recognizing that a defense case does not "contemplate the employment of wholly unlimited time and resources"). They must make reasonable investigations with the time and resources at their disposal. The majority conclusion hinges a great deal on the fact that counsel could have launched an investigation into Montes based on his comment to a reporter in 1986. This issue was litigated in a motion for a new trial that was denied. Defense counsel could not be expected to deploy more of its resources on an avenue of investigation that did not yield results. Moreover, Montes' arrest and detention records, which conclusively refuted his testimony about witnessing abuse by Lopez, were in the possession of the State. Therefore, even the most diligent counsel could not be expected to have recovered this evidence absent the cooperation of the State. *See Banks v. Dretke*, 540 U.S. 668, 695-96 (2004) (noting that "[o]ur decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed").

The majority also concludes that, even if counsel was reasonably diligent in uncovering the evidence related to Montes, Lopez failed to demonstrate that no reasonable juror would have convicted him. I do not share the majority's view of the strength of the evidence against Lopez. Physical evidence showed that Jessica had been abused and what

implements were used to perpetrate this abuse. But that evidence did not identify the abuser. The only evidence that Lopez was responsible for the abuse was Maria's testimony that Lopez abused Jessica on many occasions and Montes' testimony that he witnessed Lopez drag Jessica off by her hair. Thus, the only witnesses that pointed to Lopez's guilt were Maria—the only other adult responsible for Jessica's care and another possible perpetrator of the abuse—and Montes, whose testimony was rendered wholly incredible by the undisclosed *Brady* evidence.

The majority relies on Maria's testimony as a sufficient basis on which the jury could have concluded that Lopez was responsible for Jessica's death regardless of the veracity of Montes' testimony. However, Maria's testimony is problematic for many reasons. First, Maria's testimony contained notable inconsistencies. When questioned by police, she was not forthright with the investigators and did not immediately implicate Lopez in the abuse. Her testimony was inconsistent regarding when she contends that Lopez burned Jessica, how the burns occurred, and how she discovered the burns. Further, her testimony that much of the abuse occurred in her home without her knowledge or intervention and that she left her severely burnt four-year-old child alone to attend a party at her in-laws' residence was inconsistent with what one would expect of a reasonable person exercising common sense. Second, when questioned by the police about the crimes, whether or not the belief was encouraged by the officers, Maria appeared to believe that the State offered her a plea deal and would not prosecute her if it prosecuted Lopez. Third, several years after Maria testified, she left the country and recanted her testimony.



Therefore, as the State failed to turn over evidence that completely undermined Montes' testimony and the remaining evidence against Lopez did not conclusively point to his guilt, I conclude that the district court erred in denying Lopez's petition as barred by laches.

*Torture instruction*

I also conclude that the district court erred in denying Lopez's claim that he is actually innocent based on an invalid torture aggravating circumstance because, in my view, but for the instructional error, "no reasonable juror would have found him death eligible." *Pellegrini*, 117 Nev. at 887, 34 P.3d at 537. The jury found two aggravating circumstances: the murder involved (1) torture and (2) depravity of mind. As recognized by the majority decision, the latter circumstance is invalid. *See Smith v. State*, 114 Nev. 33, 37 n.3, 953 P.2d 264, 266 n.3 (1998); *Domingues v. State*, 112 Nev. 683, 702, 917 P.2d 1364, 1377 (1996); *Robins v. State*, 106 Nev. 611, 629, 798 P.2d 558, 570 (1990); *see also Godfrey v. Georgia*, 446 U.S. 420 (1980). Although the jury also found the torture aggravating circumstance, the instruction failed to include necessary language that "the murderer must have intended to inflict pain beyond the killing itself." *Domingues v. State*, 112 Nev. 683, 702, 917 P.2d 1364, 1377 (1996).

I conclude that had the jury been properly instructed that the torture aggravating circumstance required some act of physical abuse beyond the act of killing itself, no reasonable juror would have found Lopez death eligible. "[M]ost murders do not qualify as torture murders." *Id.* at 702 n.6, 917 P.2d at 1377 n.6. It is difficult to prove that the murder was committed with the "intent to inflict pain beyond the killing itself"

and for the purpose of "revenge, extortion, persuasion," or some "sadistic[7] purpose." *Hernandez v. State*, 124 Nev. 978, 984, 194 P.3d 1235, 1239 (2008), *overruled on other grounds by Armenta-Carpio v. State*, 129 Nev. Adv. Op. 54, 306 P.3d 395 (2013). Thus, the burden of showing a murder by torture is a difficult one to meet as demonstrated by cases with far more compelling evidence that nonetheless failed to meet that burden. In *Chappell v. State*, 114 Nev. 1403, 1410, 972 P.2d 838, 842 (1998), the defendant severely beat the victim and stabbed her in the groin, chest, and neck. Some of the wounds even penetrated the spinal cord. *Id.* This court concluded that the pattern of violence against the victim was not sufficient for the jury to conclude that "the [defendant] intended to cause [the victim] cruel suffering for the purposes of revenge, persuasion, or other sadistic pleasure" and did not "rise to the level of torture." *Id.* And in *Domingues*, 112 Nev. at 702-03, 917 P.2d at 1378, this court concluded that the defendant's attempted electrocution and repeated stabbing of a child did not amount to torture.

The facts presented in this case do not show that Lopez engaged in acts intending to inflict pain beyond the killing itself. The evidence showed that Lopez's repeated acts of abuse occurred while disciplining Jessica. His reactions to her perceived misbehavior were excessive and the methods employed to address the behavior were rash

---

[7]The American Heritage Concise Dictionary defines "sadism" as "[t]he association of sexual gratification with the infliction of pain on others" or the "delight in cruelty." *The American Heritage Concise Dictionary* 722 (3d ed. 1994); *see also Webster's Third New International Dictionary* 1997-98 (2002) ("the infliction of pain upon a love object as a means of obtaining sexual release" or the "delight in physical or mental cruelty").

and horrendously cruel. But the evidence did not indicate that Lopez delighted or took sadistic pleasure in the cruelty in which he engaged. Further, the acts, in and of themselves, caused pain, but were insufficient to cause the victim's death. In fact, the victim died due to an ulcer that was caused by the aggregate abuse. As no act by Lopez was sufficient to cause the victim's death, the acts could not be viewed as intended to inflict pain above and beyond the killing. Accordingly, I conclude that the district court erred in concluding that Lopez failed to demonstrate a fundamental miscarriage of justice based on this claim.

Consequently, I would reverse the district court order denying Lopez's petition and remand with instructions to grant the petition.

_____, J.
Cherry

cc:    Hon. Kenneth C. Cory, District Judge
Federal Public Defender/Las Vegas
Attorney General/Carson City
Clark County District Attorney
Eighth District Court Clerk

SUPREME COURT
OF
NEVADA

(O) 1947A